WILLIAM A. COPPAGE v. LAWSON C. BARNETT, Admr. et al.

1. FRAUD AND FRAUDULENT CONVEYANCE: WHEN SUBSEQUENT PURCHASER BOUND BY.—A conveyance, for a valuable consideration, made with the intent on the part of the grantor to hinder and defeat his creditors, of which the grantee had notice at the time of his purchase, is not void as to a subsequent purchaser from the grantor, with notice of the grantee's claim; *aliter* where the conveyance is merely colorable and without consideration.

2. GIFT: CONSTRUCTIVE DELIVERY SUFFICIENT.—It is not essential to the validity of a gift of personalty by a recorded deed, that there should be an actual delivery of the property; it is sufficient if there be a constructive delivery, with a continued and open acknowledgment of the donee's right by the donor; and hence, where a father made such a gift of several slaves to his minor child, then residing with another, and delivered a portion of the slaves under the deed, which returned to his possession with the child, and thereafter all of the slaves remained with the father and child, and the father and all of the family, from the date of the deed, always spoke of and recognized the child's title as valid, it was *held* that the gift was good and effectual in law, and vested a good title to all the slaves in the donee.

3. TRUSTS: RESULTING: WILL NOT BE RAISED, WHEN ONLY A PORTION OF THE PURCHASE-MONEY BELONGED TO THE PARTY WHO SETS IT UP.—Where a written title to a slave is taken in his own name by one who purchased with funds belonging to himself and another jointly, if there be no understanding or agreement between them at the time, in reference to the purchase, and if it do not appear to what extent they were severally interested in the purchase-money, no trust will result in favor of the party whose means were so used, to the extent of his interest therein; but the title will vest in the purchaser,

who will become a debtor to the other to the amount of his money used in the purchase.

4. PARTNERSHIP: EVIDENCE: DECLARATIONS OF ONE PARTNER NOT ADMISSIBLE AGAINST THE OTHER TO DEFEAT HIS TITLE.—The declarations of a copartner in disparagement of his associate's title, and claiming that his interest in the property had been conveyed to himself, if made without the knowledge of his associate, are not admissible in evidence, in favor of a purchaser from the declarant, to defeat the title of the other partner; and hence, where a father and his son residing in Tennessee, carried on a plantation in partnership in this State, the son owning in his own right, at the formation of the partnership, the land and most of the slaves, and the father, who was the principal manager of the business, frequently declared on his visits to this State that, by an agreement between him and his son, he had become the sole owner of the plantation and slaves; and when the slaves were levied on to satisfy the son's debts, the father made oath that they were his property, and not liable to the executions against his son, and afterwards sold the property; it was held that the declarations and oath of the father were not admissible in evidence against the son in a suit by him to recover the property from the purchaser.

5. PRINCIPAL AND AGENT: ABSOLUTE SALE BY AGENT, WHEN CONSTRUED A MORT-GAGE.—An absolute sale made by an agent who was only authorized to execute a mortgage, is not binding on the principal, and if disaffirmed by him, it will be construed in favor of the purchaser, as a mere security for the return of the purchase-money applied to the use of the principal.

APPEAL from the District Chancery Court at Carrollton. Hon. Henry Dickinson, vice-chancellor.

On the 16th of April, 1851, the appellant, William A. Coppage, filed his bill in the Vice-Chancery Court at Carrollton, against Lawson C. Barnett and Margaret E. Barnett (formerly Coppage), his wife, to recover certain slaves and other property as hereinafter set out.

The bill alleges that the complainant was born in the State of South Carolina, in the year 1806, and that soon thereafter his mother died, leaving himself her only issue, and his father, William Coppage, surviving.

That said William Coppage was soon afterwards appointed his guardian, and, as such, received for him from his mother's estate a slave named Violet, who after his mother's death had issue: Lucy, Davy, Seymour, and Laura.

That William Coppage, as guardian for complainant, about the

year 1812, received his distributive share in his grandmother's estate, viz.: slaves Bob, Ned, and Flora.

That about 1817, his said guardian received for him, from his uncle John Borden's estate, slaves Gritta and child, Louisa and child, Levy, and Jenny; and that the said William A. Coppage held in his possession all of the above-named slaves, from the time they were received by him, until complainant's majority in 1827.

That in 1831 or 1832, complainant and his said guardian had a settlement in the State of Tennessee, when the said William Coppage was found to be largely in his debt for property of complainant which he had sold, and for the use of the balance, after being allowed $2000 or $2500 for his education and support. That in part payment of said indebtedness, said William Coppage conveyed and delivered to the defendant the following slaves (Their names are not set out in the bill, but their names and ages appear from the bill of sale executed by William Coppage to complainant to be as follows, viz.): Merriman, aged 45; Robin, aged 30; Jim, aged 25; Bob, aged 21; Elvey, aged 50; Flora, aged 25; Ned, aged 6; Bearer, aged 19; Rose, aged 16; Dave, aged 12; Leyman, aged 10; Laura, aged 17; Ben, aged 5. After said sale there still remained a balance due of $4000 or $4500, for which, said William Coppage gave his note to complainant. A statement of said settlement was filed for record in Henderson county (Tenn.), but is lost.

That in 1834, complainant and William Coppage settled the said slaves on a plantation in Yallabusha county, in this Sate; the complainant owning the said slaves and land, and William Coppage putting on the plantation only two or three slaves; but the complainant, as a mere gratuity to his father, William Coppage, permitted him to have an equal share in the profits of said planting partnership. In 1844, complainant and William Coppage entered into a partnership or contract with Ford, which is filed as an exhibit, and is in substance a lease of the plantation and slaves, stock, &c., in this State, to Ford, for ten years, expiring on the 25th December, 1854, for which Ford paid $4000. Ford was to have one-half the profits, and the other half was to be paid to complainant and William Coppage, after deducting a support for defendant, Margaret E. After the expiration of the lease, Ford was to redeliver possession, and to receive back the $4000 advanced, but without interest. This

contract was signed by Ford, and complainant, and William Coppage.

That in 1847 Ford died, and his executor being anxious to be relieved from the contract, by consent of all parties the contract was, in September, 1848, assigned to defendant, Barnett, who had in the meantime intermarried with Margaret E. Coppage, the complainant's half sister.

That on the 8th of Febuary, 1848, the complainant conveyed the said land to William Coppage, for no purpose but to enable him to sell it and pay the $4000 to Ford's estate and cancel the lease, which Ford's executor desired to do; and that afterwards William Coppage sold the land to Barnett for $4000, greatly below its value, and Barnett received the same in full of his claim, under the Ford transfer. That Barnett also at the same time, by stratagem and fraud, procured from said William Coppage a bill of sale for the greater part of the negroes on the plantation. That Barnett had married his half sister, Margaret E. Coppage, daughter of William Coppage, and the latter was old and infirm, and Barnett took advantage of his mental weakness, and procured said bill of sale fraudulently when the complainant was the owner of the property.

That Mrs. Barnett pretends to some claim to the negroes under some deed of gift. The consideration for the sale of the land and the negroes appears, by a memorandum furnished by Barnett and made an exhibit to the bill, to have been the $4000 advanced by him to Ford's executor; $3182 paid by him on a judgment in favor of the Union Bank of Tennessee against the Coppages, and which two items the bill admits to be just and correct; also, $1636 paid by Barnett on account of sundry claims against the property, and $3800 for certain slaves which Barnett and wife claimed to belong to them under a deed of trust, and which had been sold and the proceeds applied, as alleged, to the use of William Coppage and complainant. The correctness of these two last items is denied by the bill, and the sale of the slaves by William Coppage is alleged to be without authority, and that Barnett had notice of it.

The bill charges that the defendants have in possession the following slaves, viz.: Ailsey, and Jim and Bob, her children, purchased by complainant from William Coppage in 1831 or 1832:—

Lucy, the child of Violet, and Lucy's children, Ailsey, Jr., Mary, Aaron, John, Excy, and Nancy; that Violet was received from his grandmother's and grandfather's estate, in 1812; also the following children of Violet, viz.: Davy, Seymour, and Laura; and Sarah and Malvina, the two last children of Laura:

Also the following, received from John Borden's estate, viz.: Lucy, and Jinny and her children, Washington, Calvin, Martha, Ritta, Harriet, Jake, Emanuel:

Also the following, purchased from complainant Ann Barnett, in 1838: Eliza, Stephen, Visa (or Levice), and Joe:

Also Charles, purchased from Samuel Temple in 1835 or 1836:

Also Ned, child of Flora, who was received from his grand-mother, as part of his mother's estate; and mules, stock, cotton, &c.

The answer of L. C. Barnett and wife denies all the titles set up by complainant under the division of estates in South Carolina; denies all knowledge of the settlement and bill of sale of negroes in 1831 or 1832; but alleges that William Coppage informed defendant, Barnett, that to defraud his creditors he made a transfer of some slaves to complainant, but when he got free of his debts it was cancelled, and that William A. Coppage had no title whatever.

The answer states that Barnett married Margaret E. Coppage in 1847; that he then had a capital of $8000 or $9000, and that he was induced by William Coppage to come to Mississippi and employ it in paying the debts of the firm of William Coppage and William A. Coppage, with the understanding that he should be reimbursed out of the property, and that complainant knew of the inducements so held out, and promises so made to him; that William Coppage managed everything in relation to the Mississippi property, and was in possession of it, and claimed to be the owner and proprietor of it; admits the lease to Ford, and its transfer to himself by solicitation of all parties, and files as an exhibit the assent of William and William A. Coppage to the transfer; that he took possession under the lease, and held it until April, 1849, and accounted with William A. Coppage for one-half the proceeds.

That he paid debts of the firm in Tennessee and Mississippi to the amount of $8000 or $10,000; that when respondent went to Tennessee to get the money to pay the Union Bank judgment, he informed complainant that he would not pay it without reimburse-

ment, and complainant, manifesting a total indifference to the matter, assented; that before paying said judgment for $3182, he made the purchase and obtained the bill of sale for the slaves mentioned in the bill, from said William Coppage, in order to reimburse him for the money advanced for the parties, and that he delivered to said William Coppage all the notes and vouchers paid off by him, both against said William Coppage and the complainant. Denies that he used any fraud, or took any advantage of said William Coppage in said purchase, and alleges that he gave a full and fair price, according to a valuation made in 1848 or 1849, by said William Coppage, with the view of setting apart a sufficiency of the property to pay all the debts, and of dividing the remainder between himself, complainant, and Mrs. Barnett.

The answer claims title to slaves Ailsey, Dave, Seymour, Bob, Laura, and Sarah (which are not included in the bill of sale by William Coppage to Barnett), by virtue of a deed in trust executed by said William Coppage in Kentucky, in 1829, conveying said slaves and others to a trustee for the benefit of Mrs. Barnett, then Margaret Coppage; that this deed of trust was recorded in Kentucky soon after it was made, and was delivered to Barnett, in 1847, by William Coppage, and the slaves last above mentioned were delivered to said Barnett by said William Coppage in 1849, at the time he made the purchase aforesaid.

That three of the negroes and their offspring, conveyed in the deed of 1829, had been sold by William Coppage, and the proceeds applied to the payment of the debts of complainant and said William Coppage; that in 1847, when William Coppage delivered said deed of trust, he promised to reimburse Mr. Barnett for the negroes so sold, and the charge of $3800 being an item in the payment for the negroes purchased and in controversy, is founded on that deficit and promise.

The answer further states, that whilst it may be true that the negroes Eliza, Stephen, Visa, Joe, and Malinda, were purchased by complainant from Ann Barnett, yet at the time respondent made the purchase, the said William Coppage exhibited a bill of sale of these negroes from complainant to him, made in 1842.

That for many years previous to respondent's purchase, complainant took no control over the property, and exhibited no inte-

rest in it, even when it was levied on, and under the hammer; that Ford and respondent both accounted with William Coppage alone, under the lease, and that respondent made the purchase under the firm belief and under the most solemn assurance of William Coppage that his title was good; that complainant was advised of the purchase soon after it was completed, and made no objection until 1850, when the property had risen very much in value, and then his only objection was that William Coppage had sold it too low.

The answer further states, that soon after the purchase, respondent visited Tennessee, and sought opportunities frequently to explain the transaction to complainant, but that he was so habitually intoxicated that he was unfit for business. Respondent proposed to complainant, in 1850, that if he would show a title and pay back the money, respondent would give up the property.

Respondent knows nothing of the want of consideration for the deed for the land, but denies that it was made for the purpose of paying Ford's estate, as the deed is dated in February, 1847, and Ford did not die until the succeeding August: and the respondent denies that he took the land in full discharge of the $4000 advanced to Ford, and of his interest under the lease.

The complainant showed title to the following slaves:—

1. Ned, by descent from his grandfather,—he was also embraced in the conveyance made by William Coppage to him in 1833.

2. Lucy and Isaac, received on division of his mother's estate, in 1812, after which Lucy had issue, Ailsey, Jr., Mary Ann, Excy, Aaron, and John.

3. Topp, Girtta and child, Louisa and child, Levy, and Jinny, received from John Borden's estate, in 1817. Jinny had issue after he received her, as follows: Martha, Washington, Calvin, Edmund, Ritta, Harriet, and Jacob.

All of the above slaves, and such as were born before 1827, were in the possession and use of William Coppage, his father and guardian.

4. Charles, purchased by complainant of S. Temple, in 1836.

5. Eliza, Stephen, and Visa, purchased of Ann Barnett, in 1838. Eliza had issue, Malvina and Laura.

6. Merriman, Robin, Jim, Bob, Ailsey, Sr., Flora, Ned, Bina, Rose, Dave, Seymour, Laura, and Ben, he purchased from William Coppage, on settlement, on the 20th June, 1833.

The following twenty-three slaves were embraced in the bill of sale made by William Coppage to Barnett, in 1849 :—

1. Ned, child of Flora, and received from complainant's grand-father's estate, and also included in the bill of sale made by William Coppage to William A. Coppage, in 1833.

2. Visa, received from his uncle John Borden's estate.

Levi,    "        "        "

Jinny,    "        "        "

And her children, Washington, Martha, Calvin, Edmund, Ritta, Harriet, Jacob.

3. Lucy, received in 1844, from his mother's estate, and her children, Ailsey, Jr., Mary Ann, Aaron, Excy, and John.

4. Stephen, bought by complainant of Ann Barnett, in 1838.

Joe,    "        "        "

Eliza,    "        "        "

And her children, Louisa and Malvina.

5. Charles, bought by complainant of S. Temple.

The following slaves were in the possession of the defendant, and claimed by William Barnett, under a deed in trust made by William Coppage, for her benefit, in 1829, viz.: Ailsey, Sr., Dave, Seymour, Bob, Laura, and Sarah, and they were also claimed by complainant in virtue of the sale made to him, in 1833, by William Coppage.

Records from the State of South Carolina were introduced by complainant, which established his title to the above slaves, so far as they are stated to have been received by him from his uncle, John Borden, and from his mother's estate, and he had bills of sale from Ann Borden, S. Temple, and William Coppage, for the slaves claimed through them.

He also introduced a record from the Orphans' Court of South Carolina, from which it appears that in 1825 William Coppage, as his guardian, filed a petition in that State for an allowance for his support and education, alleging that he, the said William Coppage, was unable to support him in the style to which he was entitled, and setting out also that complainant was the owner of fourteen slaves, of which seven were working hands, and also of a plantation, and that his net annual income amounted to about $300. Upon this petition the Court made an allowance to William Coppage, for the support and education of complainant.

A paper is also found in the record purporting to be a transcript of the record of the Orphans' Court, in South Carolina, in relation to the guardianship of William Coppage for complainant, which was relied on by defendant to show that the indebtedness of William Coppage to complainant was not as much as was found upon settlement, in 1833, made by the witness, C. Temple. But this paper does not appear to have been filed, nor to have been certified by the proper officers.

The points in issue by the proof and pleadings, and litigated in this Court, were as follows :—

1. The sale made, in 1833, by William Coppage to complainant, was alleged to be fraudulent and without consideration, by the defendant.

2. The deed of gift made, in 1829, by William Coppage to Mrs. Barnett, was alleged to be void as to complainant, because it was voluntary, and there was no delivery of the deed and slaves, and complainant was a purchaser of the slaves, so given, for value, by the settlement of 1833.

3. The respondent alleges that the complainant never had any title to the property in Mississippi, being that in controversy, and if he had, it was divested out of him and vested in William Coppage, by an arrangement made about the time of the lease to Ford, in 1844, by which complainant was to have the property in Tennessee, and William Coppage the property in Mississippi, and that the land was conveyed to William Coppage in pursuance of this arrangement, and that William Coppage had a bill of sale from complainant for certain slaves.

4. That if any title still remained in complainant to the Mississippi property, William Coppage was the general agent of complainant and was authorized to sell it; and that complainant afterwards ratified and assented to it.

5. It was alleged by respondent that the charge for $3800 for the slaves of defendant Margaret, conveyed to her in 1829 and sold by William Coppage, was proper, inasmuch as the proceeds of said sale had been applied to the payment of the debts of complainant and William Coppage.

6. Barnett alleged that he purchased without notice of complainant's title.

7. Complainant alleged that the sale to Barnett was for an inadequate price and fraudulent.

The testimony is quite voluminous, but the material points will be set out, as it relates to the above property and in the order there stated.

I. As to fraud in settlement of 1833, Charles Temple was examined by complainant twice. In his first deposition he states that in the year 1833, in Henderson county, Tennessee, William Coppage was security for Samuel Wilson & Co.; that suit was threatened, and William Coppage called on witness for advice and assistance. Witness asked him if complainant had ever called for a settlement of his guardian accounts. William Coppage said he had not. Witness then directed him to go home and tell complainant to call for a settlement. In a few days William Coppage and complainant came to witness's house and brought all the papers and vouchers in relation to the guardianship. Witness made the settlement as correctly as he could, and the old man was found to be largely indebted. The deposition then read as follows, " He (William Coppage) then sells out all his negroes, that the right was in him, which negroes were Merriman and Robin, purchased with the proceeds of the sale of two or three negroes cost $1500; the balance of the negroes which were in the old man's right, I sold at the full market price, and William A. Coppage bought them as such. He bought all the horses, and after the sale the old man was indebted to him in about $4000 or $4500. Afterwards I turned round and asked the old man if he acknowleged the delivery of the property to William A. Coppage, and he replied he did. I then asked William A. Coppage if he acknowledged the receipt of the property delivered by the old man, and he replied he did." Witness then drew a promissory note for the balance, of about $4500, and the old man signed it and handed it to complainant. · Witness then took the settlement and filed it with the register for record. The witness's second deposition was in substance the same as the above, so far as it relates to the question of fraud in the sale.

William Coppage, for complainant, first deposition :—

Witness acted as guardian for complainant and held his property from about the year 1806 until he arrived at full age; and afterwards witness and complainant held it jointly. His property con-

sisted of negroes, stock, farming utensils, &c. "We bought land both in Tennessee and Mississippi with the proceeds." Witness used the property for the support of his family and raising negroes. They had a settlement in 1832, with the assistance of Charles Temple, which resulted in a balance against witness of $2000 or $3000. There were then from twenty to thirty-five negroes in their possession, and witness conveyed to William A. Coppage all his interest "in all the negroes except eight." "The names of them I remember are Merriman and Robin; these two I bought and conveyed to him in payment of claims against me by William A. Coppage."

Witness, on cross-examination, in answer to. a question as to whether the conveyance in 1832 was not made to defeat creditors, said "that the settlement was made to give William A. Coppage his portion of the property. Witness did not know but that debts might come against him; but none ever did. Witness did not consider it .a sham transaction, as William A. Coppage only got his rights anyhow; they both used it after the transfer just as before; both managed the property." Neither Violet nor any of her children were included in the transfer or sale made in 1832.

In his second-deposition this witness states, that he conveyed all the negroes to William A. Coppage in 1832, and is unable to state how the mistake occurred in his first deposition, wherein he states he conveyed all but eight. He also states that all Violet's children were included in said bill of sale, and he is unable to explain why his first deposition states differently. He also stated that he never paid up the note for $4500, given by him to William A. Coppage on that settlement, but the same was afterwards delivered up to him by his son. He further stated, that Eliza and her children, purchased from Ann Barnett in 1838, were purchased with the proceeds of cotton raised on the plantation in Tennessee, in which he and complainant were jointly interested.

Hartwell Temple, for defendant, states, that he resided within one-half of a mile of William Coppage and William A. Coppage, in 1828, and for five years thereafter, and then two and a half miles from them for five years, and then six miles from them till 1840. William Coppage was concerned with Wilson in merchandising. Witness never knew him to be out of debt. It was said that Wilson

was broken up, and that William Coppage was liable for his debts, and had transferred all his property to his son. William Coppage had control of everything from beginning to end. Witness knew no difference in the management of the property after the transfer.

M. Bradford, for complainant, states that before settlement, in 1833, William Coppage had entire control of the property; afterwards William A. Coppage took control. The old man remained on the place, but who managed witness is unable to say.

See also John D. Davis's deposition, under No. III.

It was also shown that William Coppage had received a considerable sum of money as guardian for complainant, and that he had sold two of complainant's slaves, and had bought a tract of land in Tennessee with his means.

II. As to the deed of trust of 1829. The deed of trust was dated August 17th, 1849, and the trustees on that day accepted the trust by a written memorandum indorsed on the deed; and it was also proven by one of the subscribing witnesses, and recorded in the County Court of Scott county, State of Kentucky.

The answer of Barnett states that it was delivered to him in 1847, by William Coppage, and the slaves claimed under it were delivered to him in 1849, when he bought the other slaves in controversy.

Mrs. Ballard, for the defendants, states she is the sister of the mother of Margaret Coppage (now Barnett); that Mrs. Coppage was in bad health, and witness took Margaret when she was about five months old, and kept her thirteen months, and afterwards, when Margaret was two years old, she took her again and kept her until she was about seven years old. William Coppage placed two or three negroes with witness, which he said belonged to Margaret under a deed of trust which he had made. At first he put Binah and Laura with witness. Binah went back, and he sent Rose. These two stayed with witness until Margaret left. William Coppage always " spoke of them as her negroes, and so did she and the other members of the family. There was no dispute during that time about the right to the negroes, as far as witness heard."

Mrs. Ford, for the defendants, states that when the lease was made by her husband (Ford) in 1844, she was present, and it was understood that Margaret had a claim on some of the negroes in Mississippi, and she was provided for in the lease. William A. Coppage was

present and made no objection to her claim. The particular nature of her title was not mentioned, but it was well understood in the family that John Coppage was trustee in the deed made for her benefit in Kentucky. William A. Coppage was at witness's house in 1844. Margaret was then living with witness. William A. Coppage was speaking of the sickness among the negroes at home in Tennessee, and said to Margaret that she ought to go home and attend to them, for she was as much interested as he was. Witness is a sister of Margaret's mother.

William Coppage, in his second deposition, on cross-examination by defendants stated, that he always wished Margaret to have the negroes conveyed in the deed of trust of 1829; confirms Mrs. Ballard as to the sending of Binah, Rose, and Laura. Rose was taken by an officer and sold, and witness afterwards bought her back. That he would not have conveyed these negroes to William A. Coppage if he had not been told that they were subject to his debts. Three of them (those mentioned in the deed of 1829) had already been sold, and he thought the balance were liable, and the deed for the benefit of his daughter not valid.

III. As to the title of the property in Mississippi, &c., Mrs. Ford, for defendants, stated that she was present, in 1844, when the lease to her husband was made; that it was then talked of and understood between the Coppages and her husband, that complainant was to have the Tennessee property, and that William Coppage and his daughter (Margaret) was to have the Mississippi property. William Coppage was to pay the debts that were then pressing them. It was understood that the lease was to disencumber the Tennessee property on William A. Coppage's account.

After the lease was executed, witness and her husband spent the winters in Mississippi, on the plantation. William Coppage came about once a year to settle and receive his share of the proceeds. He claimed the negroes and farm as his own, except those claimed by Margaret. She claimed —— and her children, by will from her grandfather, and the others under the deed in trust of 1829. William Coppage offered to sell the plantation and the negro Eliza to Mr. Ford. He showed a deed for the land, and a bill of sale for Eliza and her children. William Coppage afterwards gave these papers to witness, and she kept them until he was about to

leave, when she gave them up to him, he saying that those papers were his title to the property.

After her husband's death, she went to Tennessee to see William Coppage about their business, in relation to the lease. He was not at home; he was gone to the plantation in Mississippi. William A. Coppage was at home, and witness tried to get him to make some arrangement about the business. He declined to do so, saying that his father was from home, and that he would have nothing to do with it. Witness applied to him several times, and finally told him that Mr. Barnett was willing to take the lease. He said he did not care what the old man and Mr. Barnett did; they might do as they pleased. Witness then got him to give his written consent to the transfer of the lease to Barnett.

This witness proves the reception of a letter from William Coppage, dated 29th September, 1847. In this letter William Coppage, after expressing his regret at the death of Mr. Ford, of which he had recently heard, and stating his determination to do all in his power to settle their business matters satisfactorily, stated that Ford had offered, in his lifetime, to Barnett and his wife, to transfer the lease to them, if they would repay him the $4000 advanced, and that he advised William Coppage to sell the Mississippi plantation; which he intended to do, if he could only get enough to pay Ford, and that he had already conditionally sold it. That he had offered to give up all the business of that place to Barnett, but that he and Margaret did not want to go there, and to have anything to do with it.

James Cook, for defendant, proved various declarations of William Coppage to the effect that he was the owner of the plantation and slaves in Mississippi, except some slaves belonging to Margaret E., and further, that William Coppage stated that Barnett was to come down and take control of the plantation. That Barnett was to pay Ford, and all the other debts due by the plantation, and that he then was to make him a title.

This witness also proved that after Ford leased the plantation, William A. Coppage never came to Mississippi until the year 1850; that before the lease he frequently came.

George Loudon, for defendant. Witness was overseer on the plantation in 1847. William Coppage came down and made arrangements to supply the plantation with provisions, &c.

John D. Davis, for defendant. Witness lived with William Coppage and William A. Coppage as overseer on the Mississippi plantation. William Coppage employed him and paid him. William A. Coppage told witness that he had nothing to do with managing the business, and that his father had the entire management. He also told witness that his father and some other man had gone into business, and had borrowed money to buy goods, and that William Coppage made over his negroes to him, to avoid said debt, and that he held the negroes under a sham title. He never spoke of any other title he had to the property than the sham title.

Ransom Turner, for defendant. William A. Coppage employed the overseer in 1844. Witness was administrator of this overseer in 1845, and went to Tennessee for the purpose of collecting his wages, and also a note on William A. Coppage for $410. Witness presented them to William A. Coppage, and he told witness to go to his father, who had the settling of that business, and the payment of the debts. The old man settled these debts, and was frequently in Mississippi, from time to time, until the spring of 1849, and settled all the debts. When in Tennessee, in 1845, William Coppage said he was going to take charge of the Mississippi place, and that William A. Coppage would take charge of the Tennessee place ; that William A. Coppage had got in debt, and he was going down to take charge, and pay the debts. William A. Coppage said he was going to live in Tennessee ; that he was going to build a fine house (pointed out the location), and was going to try to marry a wife.

John Baker, for defendant. Witness is a justice of the peace. On the 24th of April, 1848, William Coppage made an affidavit before him, which is set out in his deposition, and appears to be in substance as follows: that the slaves, Seymour, Dave, Bob, Ned, Stephen, and Washington, levied on as the property of William A. Coppage, in the case of *The Union Bank of Tennessee* v. *William A. Coppage, and others*, are not the property of William A. Coppage, or liable to said execution, but they are the property of affiant.

A. Herron, for defendant, proved that in 1848 William Coppage denied that the property in Mississippi was William A. Coppage's, and stated that William A. Coppage had a plantation in Tennessee, which was enough for him.

William Coppage, on cross-examination by defendants, did not recollect of the declaration made to Cook, Mrs. Ford, Davis, and other witnesses, as stated by them, and says, if he made any such, they were without the knowledge or authority of William A. Coppage; he acknowledged that he made the affidavit as proven by Baker, and states that he claimed those negroes then.   In his examination in chief he states that he has owned no slaves since the settlement with William A. Coppage.

He denied ever offering to sell to Ford, Eliza and children, and stated he never showed a bill of sale for them to Mrs. Ford; he never had any such paper.   In his first deposition he states there might have been such a paper, but he does not recollect it.

Middleton Bradford for complainant states, that he and William A. Coppage, in 1836, purchased the Mississippi plantation, in partnership.   Witness afterwards sold out to William A. Coppage. Complainant had ten working hands on the place, among whom he recollects the names of Ben, Lucy, Dave, and Seymour.   Witness was surety in the Union Bank debt for William A. Coppage, and made two attempts to have the slaves on the place sold to pay it.   William Coppage filed an affidavit claiming the property, and gave bond to try the right.   " We afterwards settled it by William Coppage giving me a mortgage on the property, to satisfy the debt." Whilst complainant and witness were in partnership, which lasted for six years, witness never heard of any claimant to the property but him.   William Coppage was on the place sometimes, and gave orders, but witness never recognized him as a partner.   The property brought into the partnership was furnished by William A. Coppage.   After witness sold out, William A. Coppage controlled the property so far as witness knows; William Coppage, however, came on the place sometimes, but witness does not know that he ever gave any directions, or took any control.   When the property was levied on and about to be sold, William Coppage alone came from Tennessee and made all the arrangements that were made to save it.

Charles Temple, for complainant.   Witness made the deed conveying the land in Mississippi from William A. Coppage to William Coppage.   The conveyance was made to discharge all the debts which were due and owing by William A. Coppage in Mississippi,

and also those contracted by William Coppage, for the plantation there. William Coppage requested witness to induce William A. Coppage to make a power of attorney, but witness advised a deed. Witness also advised William Coppage to advertise the farm, stock, horses, mules, &c., for sale, to discharge the debts, and if these were not sufficient, to advertise a portion of the negroes, to draw a crowd. The intention was not to sell any of the negroes until it was absolutely necessary.

The witness in his second deposition states, that there was no allowance made, in the settlement of 1833, to William Coppage, for the support and maintenance of William A. Coppage. It also appeared from his cross-examination that William A. Coppage had made a will and left it with witness, by which he devised all his property to witness during his life, the witness to support William Coppage. Witness acknowledged that he had taken a very active part in this cause for complainant; had consulted with his counsel, &c. He also acknowledged that he advised William A. Coppage to come to Mississippi, and take the property in controversy by force, and if anybody molested him in his attempt to do so, "to blow him through."

IV. As to the agency of William Coppage. H. Temple, for defendant. William Coppage was principal in managing and in purchasing supplies and necessaries, and in making debts for their mutual support and benefit, and in disposing of property of every description, of either of them, and in the settlement and arrangement of such debts as were contracted. William Coppage and complainant lived together ever since he knew them, and the latter had every opportunity of knowing his father's transactions in disposing of property. William A. Coppage always looked up to his father in the management of his business, who acted as principal agent in transacting the business of the family. William A. Coppage was not a business man; he was dissipated, and when drinking was very imaginary.

John D. Davis, for defendant. William Coppage managed all the business in Mississippi, of which William A. Coppage was cognizant, and the latter abided by all the old man did. William A. Coppage told witness he had nothing to do with the managing the business; that his father had the entire management.

C. Temple, cross-examined by defendant. William Coppage was in the habit of selling property to pay debts, with the consent of his son. He contracted debts, bought supplies, for himself and son. They managed their business and paid debts jointly. The old man had authority to sell household property when necessary. He also sold negroes, but William A. Coppage confirmed the title.

William Coppage, cross-examined by defendant. William A. Coppage and witness always lived together, and kept their property together. "I was the principal in managing business; William A. Coppage knew nothing about managing." Witness had the direct control, and was in the habit of selling property to pay debts. Witness purchased supplies and contracted debts for the farm. William A. Coppage did not always look to witness for the management of his business, selling property, &c., for witness could not control him. When witness had money he paid the debts; he did not act as general agent, for he could not control his son.

W. Clark, for defendant, heard William A. Coppage say, in February, 1849, that Barnett was paying their debts, and was to be reimbursed in the property. That a good many of the debts were his father's, "but that his (William A. Coppage's) property would have to go to pay them." On cross-examination he stated, that in the conversation above alluded to, William A. Coppage did not say that his property was "bound for his father's debts," but in the latter part of 1850, he said "his property should go to pay the debts; that his father had contracted the greater part of them, and as well as witness remembers, his property should go to pay the debts, and no further."

William Coppage, for complainant, stated he had no authority to sell the negroes conveyed to Barnett. It also appeared that complainant was advised of the sale to Barnett soon after it was made, and it does not appear that he made any objection thereto until the year 1850.

V. As to the item of $3800, William Coppage, on cross-examination, stated, that he sold two of the negroes and their children, conveyed by him in the deed of 1829, and that the proceeds were applied to his and William A. Coppage's debts; but he does not state how much was applied for the benefit of complainant.

VI. As to Barnett's notice of complainant's title. William Cop-

page, for complainant, stated that at the time he made the sale he informed Barnett that he had no authority to sell, and that the sale was invalid without William A. Coppage's consent. It also appears as before stated, that William A. Coppage was a party to the transfer of Ford's lease, and Barnett acknowledged in his answer, that soon after the sale he went to Tennessee for the purpose of explaining this transaction to complainant.

VII. As to the inadequacy of price. W. Clark, for complainant, proved that in 1849 negroes were low; men were worth from $650 to $700; women from $600 to $650; ploughboys about $525 to $550.

John D. Davis, for complainant, proves that the plantation in 1849 was worth $3000; negro men from $700 to $800, and negro women from $600 to $650.

R. Turner states, that men were worth from $700 to $800, and women from $600 to $650.

M. Bradford stated, that men were worth from $700 to $800, and women from $500 to $600.

A. Herron, proved the plantation to be worth $3000.

The proof showed that there were embraced in the sale to Barnett, four men, aged respectively, 20 years, 45 years, 35 years, and 50 years; and two women aged 30 years each; the balance were boys and girls, ranging from nine to fifteen years of age; there were, however, one seven years of age, one five years, and one three years.

Upon final hearing the Vice-Chancellor dismissed the bill, and the complainant appealed.

*W. Yerger*, for appellant,

After stating the facts, said: First. This statement of facts makes it perfectly clear, that the land and the stock, or at least much the most of it, and the twenty-three slaves included in the bill of sale to Barnett by the old man Coppage, belonged to complainant, and the sale of them is without authority and void.

Second. Even if he had authority to sell, the sale made to Barnett would be set aside, as Barnett took an unconscientious advantage of his situation to coerce a sale. He had got into pos-

session of the property as agent, with an understanding that he would discharge the debts so as to save the property. In cases of this kind the utmost good faith must be observed, and no undue advantage taken.

Third. In relation to the slaves: Ailsey, the elder, Dave, Simeon, Bob, Laura, and Sarah, complainant is entitled to them by the sale made in 1832. It it said that sale was fraudulent. In my oral argument I have endeavored to show that this was a mistake; that William Coppage owed his son, and was bound in good faith to pay him. But if it was a sale made to avoid the payment of his debts, still it was on a valuable consideration. William Coppage owed William A. Coppage the money, and owing it to him the sale is valid, unless conditions should attach it.

On this subject the rule of law is, that a sale made voluntarily or on good consideration, although made to defraud creditors, is good between the parties, and cannot be set aside by the grantor if he should become dissatisfied. They are not only valid as to the grantor, but to his heirs,and all others claiming under him in privity of estate with notice of the fraud. 1 Story's Eq. 371, sec. 345; 3 Mason's R. 378; 4 Mass. R. 354; 16 John's R. 189; 5 Binney, 109.

But the defendant claims the slaves Ailsey, Jr., Dave, Simeon, Bob, Laura, and Sarah, by virtue of a deed of gift, made in 1829, in Kentucky, by William Coppage.

On this point it is sufficient to say, that possession never accompanied that deed; it was merely voluntary, and could not be enforced, and is subject to the imputation of having been made to defraud creditors, and was subject to the claims of creditors. The pretext of a sale by William A. Coppage to William Coppage, of the Mississippi property for the Tennessee property, based on the evidence of old Mrs. Ford, that it "was talked of and understood" that such an arrangement was made, is simply ridiculous, contradicted by all the facts and all the evidence, and by the conduct and averments of the defendant himself. The idea of proving such an arrangement by the testimony of this old woman, who knows nothing more definite than that it "was talked of and understood," probably was never before attempted in a court of justice.

As stated in my oral argument, the defendant says he took the

conveyance of the slaves before he would pay the money on the Union Bank judgment; the old man Coppage says the conveyance was made to Barnett "to save property," and Barnett told William A. Coppage he would not pay the debts of the firm of William Coppage & William A. Coppage unless he was *secured*. So that the whole transaction shows that the conveyance of the slaves was only made and intended as a *security* for the money he had paid or might pay, and not an absolute sale.

*F. Anderson* and *George S. Yerger*, for appellees,

Made the following points: 1st. The defendant, Barnett, purchased the land and slaves from William Coppage. He paid a full and fair consideration to William Coppage for both, as appears amply from the testimony.

The bill admits the sale, and the sale is proved by the old man Coppage and other witnesses.

The consideration given was the full value of both land and slaves at the time of the purchase. The bill of sale is for twenty-three negroes named, which we claim. We claim also Ailsey, Dave, Seymour, Bob, and Laura, under the deed of gift of 1829, and Sarah, Laura's child, born after said deed was made.

Barnett in his answer states he believed that the property, when he bought it, was William Coppage's. He denies that the old man told him William A. Coppage had any interest or that it required his assent. He denies all fraud, and avers he purchased bona fide from William Coppage for a full and fair consideration.

We insist upon the following points for Barnett:

First, That he is a bona fide purchaser, without notice of William A. Coppage's title, if he had any, of both the land and negroes.

Second, That all the property was, in fact, the property of William Coppage, by virtue of an agreement between them, that William A. Coppage should take the Tennessee property, and William Coppage, for himself and daughter, should take the Mississippi property, and pay all debts due by it.

Third, That some of the negroes mentioned in the sale to Barnett, were originally the property of William Coppage, and if William A. Coppage had any title, it was fraudulent as to the creditors

VOL. V.—41

of William Coppage or purchasers from him; and that as to the land, the title was in William Coppage, by deed from William A. Coppage.

Fourth, That be the above matters as they may, William Coppage had a deed as to the land, and could sell; and as to negroes and personal property, he had a general power to sell; and even if the property was that of William A. Coppage, still the sale made by the old man to Barnett was good.

*D. L. Herron*, on same side,

Filed an elaborate brief, reviewing all the evidence and commenting on the law of the case.

HANDY, J., delivered the opinion of the court.

This bill was filed by the appellant in the District Chancery Court at Carrollton, to recover certain slaves claimed as his property and in the possession of the appellee, L. C. Barnett. Some of the slaves are claimed to belong to the complainant as a distributee of certain deceased relatives in the State of South Carolina; others are claimed by virtue of a conveyance made to him by his father in the year 1833, in consideration of a large indebtedness to him by his father, who was his guardian for a great number of years in South Carolina, and was indebted to him on that account, and others are claimed under a conveyance made to him by a third person.

It appears by the pleadings and proof that the complainant and one Bradford purchased a tract of land in Yallabusha county, in this State, in the year 1836, and that in the year 1839 Bradford sold his interest to the complainant, at which time the complainant had ten working hands, besides some small slaves, on the place on which he and Bradford were carrying on the business of planting. In the latter year, the complainant and his father, William Coppage, who resided in Tennessee, settled the slaves of the complainant on the plantation, the complainant owning the land and the slaves above mentioned, and his father putting on the place, as the bill alleges, only two or three slaves, but being allowed by the complainant, as a gratuity, to have an equal interest with him in the profits. In the year 1844 they entered into an arrangement with

one Ford, by which he was to advance them the sum of four thousand dollars; in consideration of which possession of the plantation and slaves was to be delivered to and held by him for the term of ten years, to expire on the 25th December, 1854. Ford was to have the sole management of the property during that period, and the proceeds were to be divided between him and the complainant and his father, an amount to be reserved by Ford out of the share of the complainant and his father, annually, sufficient for the support of Margaret Coppage, the daughter of William Coppage, and at the expiration of the time the complainant and his father were to refund the $4000 to Ford, but without interest. This arrangement continued until Ford's death, which took place in 1847; but before that time the complainant and his father, being dissatisfied with the arrangement with Ford, became desirous of selling the land, in order to discharge Ford's claim upon the property for money advanced, and to pay off other claims against the complainant for which the property was bound, and for that purpose the complainant executed a deed in fee for the land to his father in February, 1847.

In February, 1848, the contract of Ford was transferred to the appellee, Barnett, by the consent of the complainant and his father, and Barnett carried on the plantation under it until April, 1849, when William Coppage conveyed the land to him for the sum of four thousand dollars, being the sum due him on account of the contract of Ford, and at the same time executed to him a bill of sale for the slaves claimed by the bill to be the property of the complainant. The consideration for the conveyance of both land and slaves, appears to be the four thousand dollars due Barnett, as above stated, and the sum of $3182 paid by him as a judgment against the complainant, for which the property was bound—which two items are admitted by the bill to be correct—$1636 paid by him on account of claims against the property, and $3800 for certain slaves claimed to belong to Barnett and his wife under a deed of trust, and which had been sold and the proceeds applied to the use of William Coppage and the complainant. These two last items were allowed, in part payment for the property, by William Coppage when he made the conveyances; but their correctness is denied in the bill, and the entire act of the sale of the slaves by William Coppage is alleged to be without authority, and that Barnett had notice thereof.

The bill seeks a recovery of the slaves and the mules, stock, farming implements, &c., conveyed to Barnett by William Coppage.

The answer denies the complainant's title to the slaves, under distribution in South Carolina, and avers that the conveyance by which he claims title to certain of the slaves from his father, was made to defraud the creditors of William Coppage, and that it was afterwards cancelled, in consequence of which the complainant has no title under it; and alleges that at the solicitation of William Coppage, whose daughter Margaret he had married in 1847, and for the purpose of relieving him and the complainant from a large indebtedness in Mississippi, he consented to purchase the contract of Ford, and to discharge the debts against the property; that he proceeded to pay sundry debts of William Coppage and the complainant, shown by an account filed with the answer, the items therein stated as due from William Coppage being, as is alleged, due from him and the complainant, and being on their joint account, and that these payments were all made in consideration of the assurance of William Coppage, who was the active manager of the business and of all the affairs of the complainant, that he should be reimbursed by the property for all that he might pay, and that this was assented to by the complainant; that before paying the judgment for $3182, he obtained the bill of sale for the slaves from William Coppage, mentioned in the bill, in order to reimburse him for the money advanced for the parties, and delivered to William Coppage all the notes and vouchers paid off by him, both against him and the complainant. He claims title to the slaves Ailsey, Dave, Seymour, Bob, Laura, and Sarah, under a trust deed made by William Coppage, in 1829, for the benefit of Barnett's wife; and alleges that the sum of $3800 charged against William Coppage in the payment in part of the purchase-money for the slaves conveyed to Barnett in the bill of sale, was for some of the slaves embraced in that deed of trust, which William Coppage had sold for the benefit of himself and the complainant; that William Coppage acted as the owner of all the property, and was believed to be the owner, and the purchase was made under solemn assurances of William Coppage that his title was good; and as to the slaves Eliza, Stephen, Visa, Joe, and Malinda, he admits that they were

purchased by the complainant from a third person, but alleges that William Coppage exhibited to him a bill of sale from the complainant for them, at the time Barnett made the purchase. He further states, that immediately after the sale, he went to Tennessee, and sought opportunities frequently to explain the transaction to the complainant, but that he was so habitually intoxicated that he was unfit for business; but that he believes that the complainant was informed of it soon after it occurred, and made no objection to it until January or February, 1850, at which time the property had very much advanced in price.

The record contains a great mass of evidence, which could not be stated without much prolixity. But so much of it as is material to the points in controversy will be adverted to in considering the questions presented for our determination.

The first question which we will consider is, whether the appellant is entitled to recover the slaves conveyed to him by William Coppage by bill of sale dated 20th June, 1833.

It is insisted, in behalf of the appellees, that this conveyance was fraudulent and void as to the creditors of William Coppage and Barnett, a subsequent purchaser from him, and that it cannot stand against the title acquired by Barnett. In support of this position it is said that the fraudulent intent on the part of William Coppage to hinder and delay his creditors is clearly shown, and that the appellant was cognizant of and participated in the fraud.

So far as William Coppage is concerned, the evidence fully establishes that his motive in making the conveyance was to place the property beyond the reach of certain liabilities which he expected to come against him; and in order to do so, that he conveyed the slaves to the appellant, in payment of a large debt alleged to be due by him as his guardian. The evidence also tends strongly to prove that the appellant was aware of the fraudulent purpose of his father. And if the conveyance had been impeached by the creditors of the father, there is but little doubt that it would have been condemned. But Barnett claims as a subsequent purchaser, and he admits in his answer that he had notice of the claim of the appellant, though he states that he considered it as fraudulent and inoperative. In order to claim protection as a subsequent purchaser, he must have become such without notice of the claim of the appel-

lant; and although his purchase for value and without notice would prevail against the prior conveyance to the appellant if it was merely colorable and without valuable consideration, yet if Barnett purchased with notice of the appellant's claim, and the appellant paid a valuable consideration, though with knowledge of his father's fraudulent intent as to his creditors, Barnett is not entitled to have the conveyance to the appellant declared void; for he is not, under such circumstances, a purchaser without notice; and therefore the valuable consideration paid by the appellant would protect his title against the claim of Barnett.

But it is insisted, that the conveyance was not upon valuable consideration, and that the alleged indebtedness by William Coppage to the appellant on guardianship account is feigned, and could not have been the consideration for the conveyance.

It is positively proved by the deposition of Temple, a witness for the appellant, that he made a statement of the guardianship account, having before him all the papers and vouchers connected with it, embracing a period of about twenty-six or twenty-seven years, and that William Coppage was found to be indebted in a sum largely exceeding the fair value of the slaves; that he then drew the bill of sale, the consideration stated, in which was the value of the slaves, and that William Coppage was still indebted about $4000 or $4500, for which he executed his note to the appellant.

This testimony is attempted to be impeached by the appellees as false, and a statement found in the record, showing the amount due by William Coppage as guardian in 1826, about the time the appellant became of age, is relied on to prove that the sum stated by Temple to be due is grossly exaggerated and false. But this statement appears to be a loose memorandum, found among the papers in the court below, not appearing to have been filed or admitted as proof in the cause, having no authentication, and without proof that it was taken from the records of the court in South Carolina in which the guardianship account should have been rendered, and being altogether unsatisfactory and insufficient as proof. It can therefore receive no consideration as showing the state of the guardianship account.

But the facts appearing in the record go strongly to corroborate the statement of Temple, that William Coppage was largely indebted

to his son. It appears by the exhibits to the bill that he had been his guardian since 1811, during all which time his accounts, returned to the proper court in South Carolina, show that he received a considerable amount of money belonging to his son. It appears that in 1825 he represented to the court that he had in his hands, of the appellant's property, fourteen slaves, some of which were working hands, and a tract of land, and that the clear profits of his estate were about $300 per annum; that he sold two of the slaves of his ward in South Carolina and purchased a tract of land in Tennessee with his means, and had the use and control of the appellant's property until the settlement took place. These facts render it highly probable that he was largely indebted to the appellant, and they tend to support the statement of Temple. Under such circumstances, the positive statement of Temple cannot be treated as false, by reason of some discrepancies in his two depositions in relation to other points; and upon the whole evidence, the indebtedness of William Coppage must be considered as sufficiently established.

We therefore think that the bill of sale, being upon a valuable consideration, must prevail against the claim of Barnett, who purchased with notice, and that the title of William Coppage was conveyed thereby, to such of the slaves therein mentioned as he then had the right to convey.

This brings us to the second question for consideration, which is, whether the appellant acquired a title to such of the slaves mentioned in the bill of sale as are embraced in the deed of gift executed by William Coppage, in the year 1829, for the use and benefit of his daughter Margaret, since the wife of Barnett.

It is insisted, in behalf of the appellant, that this deed is inoperative against the title acquired by the bill of sale, because possession was not delivered under it, and because it being merely voluntary, it could not stand against the claim of the appellant, who was a creditor of William Coppage at the time the deed of trust was made.

This deed of gift was made in the year 1829, and was recorded in the State of Kentucky, and a part of the slaves embraced in it, including the slave Laura, were placed in the possession of Mrs. Barnett, then a small child, by William Coppage, and declared by

him to be her property. When the child returned to live with her father, the slaves also came into his possession. It does not appear that he had possession of the slaves as his property; and as his daughter was under his custody, his possession of the slaves at the time is not inconsistent with her title to them. It further appears that these slaves were considered by the family as the property of Mrs. Barnett, and that, when the contract in relation to the plantation and slaves in Mississippi was made by William Coppage and the appellant with Ford, it was stipulated in the contract that Mrs. Barnett, then Margaret Coppage, should have a sufficient amount, out of the interest of the appellant and William Coppage in the business, for her support annually; and it is proved by Mrs. Ford that this provision for her benefit was made in consideration of her title to some of the slaves, which was acquiesced in at the time by the appellant, who was present and signed the contract.

While, therefore, the gift would not be effectual against the right of the appellant as a creditor of William Coppage, yet it was competent for the appellant to waive his right; and after having recognized the claim of Mrs. Barnett for such a length of time, he cannot be permitted to deny the validity of her title. Consequently, the appellant is not entitled to recover the slaves Ailsey, Dave, Seymour, Bob, Laura, and Sarah, slaves, and the descendants of slaves, named in the deed of gift, and embraced in the bill of sale to the appellant.

The next question to be examined is, whether the appellant is entitled to recover the slaves conveyed by William Coppage to Barnett on the 16th April, 1849, by bill of sale of that date.

In order to determine this question, it is necessary to consider several points involved in it.

The first of these is, whether the slaves conveyed were the property of the appellant at the date of the bill of sale to Barnett.

It appears, by the proofs and depositions, that the slave Ned came to him by distribution from the estate of his grandfather, Visa (or Levice), Levi, and Jinny were acquired by him from the estate of his uncle, John Borden, and Martha, Washington, Calvin, Edmund, Ritta, Harriet, and Jacob, are the children of Jinny, born since she became the property of the appellant; Lucy came to him from his mother's estate, and Ailsey (Junior), Mary Ann, Excy,

Aaron, and John, were the children of Lucy, subsequently born; Charles was purchased by the appellant. The slaves Eliza and her children were conveyed, in the year 1838, to the appellant, by bill of sale from one Ann Barnett.

But it appears, by the testimony of William Coppage, that Eliza and her children were purchased by the proceeds of cotton grown on the plantation in Tennessee, and raised by the slaves of the appellant and William Coppage. It does not appear for what reason the bill of sale was made to the appellant, nor that the slaves were held or considered as joint or partnership property. It is simply shown that some part of the money paid for them came from the means of William Coppage; but whether by loan to the appellant, or on account of indebtedness of William Coppage to the appellant, or by an understanding that he had an interest in the slaves, there is nothing in the record to show. From the facts appearing, it could not with any propriety be said that the appellant did more than use the means belonging to William Coppage to pay in part for the slaves which he purchased for himself; and in such a case the appellant would simply be his debtor for the money so used, but William Coppage would have no interest in or title to the slaves purchased, and was not competent to convey any such interest or title to Barnett, in virtue of his money used by the appellant in making the purchase. Hence it must· be concluded, for aught that appears in the record, that the appellant was the owner of these slaves.

It is said that these slaves, Eliza and her children, were conveyed by the appellant to his father, and that William Coppage exhibited the bill of sale when he conveyed to Barnett. The only evidence of such a bill of sale is the deposition of Mrs. Ford, who states that William Coppage showed a bill of sale for these slaves and the land, and offered to sell them to her husband. She does not state that she read the bill of sale, or knew its contents. Her opinion in relation to it is not sustained by William Coppage, and the existence of such a conveyance is improbable under the circumstances of the case. And, upon the whole, we do not think that the conveyance is sufficiently established.

But it is insisted that, although the slaves mentioned in the bill of sale were originally the property of the appellant, yet it is shown

that they subsequently became the property of his father.    In support of this position various circumstances are relied on, the declarations of the appellant and of his father, their conduct towards the property, and their understanding in relation to it.

The declarations showing that the property in Mississippi belonged to William Coppage, consist of affidavits and other claims made by him in judicial proceedings, while the appellant was absent and in the State of Tennessee, and of loose statements made by him at sundry times that he was to have the property in Mississippi, and the appellant was to have that in Tennessee.

As to the mere declarations and claims of property made by William Coppage, they are manifestly incompetent to affect the title of the appellant under the circumstances in which they were made. And it is probable, from the circumstances, that they were recklessly made, to subserve the temporary purpose of preventing the property of the appellant from being subjected to executions against him in this State.    It is said that, after the contract with Ford, the appellant left this State, and went to Tennessee, and did not return until after the property was conveyed by his father to Barnett; that during this period William Coppage came down from Tennessee on several occasions, attended to the business of the plantation, paid taxes, settled with Ford for the interest of the appellant and himself under the lease, &c., and that the appellant stated that he intended to live in Tennessee, and build a house and marry.    These circumstances can have but little weight against the rights of the appellant, when it is considered that he had left the plantation and gone to Tennessee, because he was altogether unfit to manage the property, being addicted to habitual intoxication, and otherwise not suited for business; that for many years previous, his father had attended to all his business in Tennessee, and exercised full control over the property both in Tennessee and in this State, and generally transacted the business connected with it; and especially that it clearly appears that he had title to the land and the greater part of the slaves upon it, which are not shown to have been conveyed to his father.

Much stress, however, seems to be placed upon the testimony of Mrs. Ford, who states that when the contract was made with Ford for leasing the plantation, it was understood that the appellant was

to have the property in Tennessee, and that William Coppage was to have that in this State. But this is clearly not sufficient to divest the appellant of his title to the property. If it had really been intended by the parties that the property in this State and in Tennessee should pass according to this alleged understanding, it is in the last degree improbable that they would have wholly failed to make conveyances to each other. There is no evidence whatever of any conveyance, by William Coppage to the appellant, of the property in Tennessee, nor any evidence showing satisfactorily that it belongs exclusively to the appellant. On the contrary, the evidence tends to show that he has continued in the possession and use of the property there since the alleged agreement, and has acted in regard to it as he had done prior to the agreement. And, in addition to this, the evidence tends to show that a considerable part of the property in Tennessee belonged to the appellant, or had been purchased with his means. Nor is there any conveyance shown of the property in this State, under the alleged agreement. But when it was found necessary, by the exigencies of the property, to make an arrangement to discharge the debts for which it was involved, a conveyance of the land was made by the appellant to his father, to be used in relieving the property of debt, not to vest the title absolutely in William Coppage. The purpose for which this deed was made tends strongly to show that the land was not understood to be the property of William Coppage, and this is strengthened by the fact that no conveyance was ever made of the slaves, which, at the time of the alleged agreement, were not in the possession of William Coppage, but continued in the possession of Ford, under his contract, until the arrangement was made with Barnett. And the fact, that under the contract with Ford, the appellant, with his father, was entitled to one half of the proceeds of the plantation during the term of the lease, which was to expire in December, 1854, appears conclusively to show that the interest of the appellant in the property was not understood to have been transferred to his father after the contract was made with Ford; for had that been the case, his name would not have been inserted in the contract as a beneficiary of the contract, nor would it have been necessary afterwards to obtain his consent to the transfer of that lease to Barnett.

There is, therefore, nothing shown that would justify the conclusion that the appellant had transferred the slaves to his father.

Again: it is said that the sale was made by the authority of the appellant or with his consent.

No direct or express authority is proved, and the circumstances do not show that any was given, or that a sale of the slaves was contemplated. The answer states that when Barnett went to Tennessee to get money to pay off the execution of the Union Bank of Tennessee, which bound the property, he told the appellant that he would not pay the debt unless he was fully secured and reimbursed, and that he replied that it was right that he should be secured; whereupon he came to Mississippi, and before paying the execution, purchased the plantation and slaves from William Coppage. He subsequently states, that immediately afterwards, he went to Tennessee, and sought frequently to explain the whole transaction to the appellant, but was unable to do so by reason of the appellant being constantly intoxicated and unfit for business.

Taking these statements as true, it is clear that an absolute sale of the slaves was not contemplated. These statements are in keeping with the circumstances of the transaction, which show that it was intended to relieve the property of the incumbrances upon it. It appears to have been believed by the Coppages that this could be done by a sale of the land. But as this could not be done, William Coppage took upon himself to sell the slaves, because, as appears by the answer above stated, Barnett would not satisfy the execution against the property, without first having a conveyance for the slaves. If this was in accordance with the consent given by the appellant to Barnett on his visit to Tennessee, before the matter was completed, as stated in the answer, there was no necessity that Barnett should put himself to so much trouble to explain the transaction to him; and the acknowledgment that he thought it necessary to explain it to him, shows that he did not consider it as made according to the consent expressed by him.

There being no evidence that the sale of the slaves was authorized or ratified by the appellant, his title remains unaffected by it.

But if he can be considered as having consented to it, according to the statements of the answer, the conveyance to him must be held as a mere *security*, and to reimburse him in sums of money to

be paid on account of the claims against the appellant's property. Such clearly appears to be the nature of the transaction from the answer, for although it is stated that the property was taken as a reimbursement for advances and disbursements, yet it is previously stated that his object was to obtain security for money advanced, and to that the appellant consented; and that the slaves were conveyed to him before he paid the money. It is therefore manifest that he could not have taken the slaves as a reimbursement for the money paid on the execution, for he had not paid the money when he received the bill of sale, and he must be considered as holding the slaves as a mere security for moneys paid by him, with the right of the appellant to refund the money paid, and thereupon to recover the slaves.

The questions, therefore, arise, for what sums of money is the appellant liable, and are the slaves chargeable?

The bill admits the validity of the sale of the land, and as that was done by proper authority, it would be binding at all events upon the appellant. Nor can he complain of the inadequacy of price, as it was agreed upon by William Coppage, whom he had empowered to make the sale. It admits the payment of the execution of the Union Bank as a proper charge, but denies the correctness of the other sums alleged to have been paid by Barnett as part of the consideration for the purchase.

The claims on which these sums were paid are stated in the account filed as "sundry claims on account current, $1486 01," and "sundry claims assumed by me, $150 00." There is no evidence in the record that the claims thus charged were debts of the appellant, or that the property was in any way bound for them; and without such proof they are manifestly not matters to be taken into the account for money advanced for the appellant or on account of the property.

The other charge is for $3800, the value of certain slaves embraced in the deed of trust of William Coppage to Mrs. Barnett, and which are charged as against William Coppage as "deficient."

There is no evidence to show that the appellant was in any way chargeable with the value of these slaves. William Coppage states in his deposition that the proceeds of the sale of three slaves embraced in the deed of trust went to pay the debts of himself and

the appellant. But the debts are not shown, and no explanation is given of the time or circumstances of the sale. The deposition shows that three slaves were sold, but the account is for these slaves and nine children. If the slaves were sold by William Coppage, the appellant is certainly not chargeable with their value, unless he received the proceeds of the sale, and of that there is no sufficient evidence in the record.

It is stated by a witness, Clark, that in January or February, 1849, the appellant said that Barnett was paying their debts and was to be reimbursed out of the property; that a good many of the debts were his father's, but that his property would have to go to pay them. This cannot be considered as a consent that Barnett should take his slaves in payment of his father's debts, for which he was in no way responsible. But there were debts contracted on account of the property, though in the name of William Coppage, and he might well have said that his property would have to go to pay these debts. He could not have intended to say that his property was bound for his father's individual debts, nor does the language show a consent that it should be so applied.

For aught that appears in the record, these charges were made against the appellant, and should not be allowed, in the account to be taken, without further and sufficient proof that they are claims for which he is liable, or that authority was given to William Coppage to allow them as claims against the property.

From these views of the case, it follows that the appellant is entitled to the slaves conveyed to him by his father in 1833, except such of them as are embraced in the deed of gift to Mrs. Barnett made in 1829; that the bill of sale made by William Coppage to Barnett is but a security for the moneys paid by him on account of the slaves, or for claims against the appellant for which he was liable or which he had agreed to pay for William Coppage; and an account must be taken stating the amount of such charges against the appellant, with interest from the date of their payment; and the value of the slaves embraced in the bill of sale of the 16th April, 1849, and their increase, and the value of their hire, and also the value of the stock and other personal property on the plantation received by Barnett, if any, and appropriated to his use.

And the decree is reversed, and the cause remanded to the Chan-

cery Court of Yallabusha county, to be proceeded with according to the principles above stated.

FISHER, J., having been counsel in the court below, took no part in this decision.